Robert C. BUCHANAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. 1974.

United States District Court
W. D. North Carolina,
Asheville Division.

Jan. 5, 1964.

Uzzell & DuMont, Asheville, N. C., for plaintiff.

William Medford, U. S. Atty., James O. Israel, Jr., Asst. U. S. Atty., Robert J. Robinson, Asst. U. S. Atty., Asheville, N. C., for defendant.

WARLICK, District Judge:

This is an action filed by plaintiff under the Federal Tort Claims Act, 28 U.S.Code §§ 1346(b), 2671 et seq., and was heard by the Court without a jury.

Plaintiff's cause of action is bottomed on negligence allegedly resulting while he was employed as a workman in a Mica Depot in Spruce Pine, in the Western District of North Carolina. He seeks to recover damages in the sum of $27,300.

The testimony discloses the following facts:

The defendant entered into a written contract with one Fletcher O. Phillips to process mica that it would purchase from local miners and have delivered to a building the defendant had leased in Spruce Pine to house such mica processing operations. The contract between Phillips and the defendant became effective July 1, 1957, but this was a continued renewal of prior contracts for the same purposes and under the same terms and by the same parties and covering similar operations in the same premises. Under the terms of this contract Phillips, as an independent contractor, was required to furnish the labor and materials made necessary to process the mica purchased by the defendant. Among the terms Phillips was to be reimbursed for all costs that he incurred and was additionally to receive a fixed fee for his services. He had complete charge of directing the work force and the manner and way in which the work was done and the objectives sought to be achieved, however the government maintained inspectors and representatives to purchase the mica and a clerical force to take care of existing circumstances of operation. The defendant leased a building in which the processing was done and furnished it to Phillips under the contract had between the defendant and Phillips, the independent contractor.

In processing the rough mica as delivered from the local miners the first step is to manually remove all rock, quartz, granite and any other foreign material from the mica which customarily is mined in chunks and then with the foreign debris removed the mica is split into sheets. Obviously this is a hand operation and the operator, known as a *rifter,* customarily holds the chunks of mica on his lap and splits it into its naturally formed sheets by the process of inserting a knife-like instrument between the layers of mica constituting the chunks and in that means prying the sheets apart. The work of rifting at this plant was customarily done by some 60 or 70 employees who sat in rows in the room used for this purpose, which was approximately 80 x 100 feet, and on the first floor of said building. The unprocessed mica was placed in boxes between two of the rifters and as the work was performed through the rifting operation the sheet mica, the scrap and the foreign materials were placed in different containers. Of necessity this type of work created a certain amount of dust.

The mica industry in the area of Spruce Pine constitutes a big commercial operation as this substance is mined more generally in that area than in any other area in the United States.

The plaintiff began working in the mica industry in 1920 when comparatively a young man and has worked in it practically all of his life.

In 1940 he was hospitalized for a lung ailment, which however according to the testimony was *not* determined as silicosis. Again in 1944 he was examined at the Western North Carolina Sanitarium and his ailment was diagnosed as being

in the early stages of silicosis. The following year he filed a claim for workmen's compensation against his employer, with the North Carolina Industrial Commission, among other things alleging that he was totally and permanently disabled by silicosis contracted in 1943 while working in another mica plant, however the Industrial Commission found among other things that he was *not* totally and permanently disabled by reason of silicosis and denied him the relief he sought.

He was again examined in 1948 at the same Western North Carolina Sanitarium and his condition was diagnosed as being Silicosis, Grade 1. He continued however to work in the mica industry as a rifter.

Thereafter and through the years from 1952 to August 25, 1958, including a period in 1956 when plaintiff worked for Phillips, the independent contractor, at this same mica processing plant, plaintiff worked in several other mica processing establishments, and on August 25, 1958, he was re-hired to work for Phillips as a rifter at the mica plant embraced in the contract between the defendant and Phillips.

Thereafter on February 21, 1959 plaintiff was again examined at the Western North Carolina Sanitarium and again found to have Silicosis, Grade 1. On February 27, he quit his work and filed a claim with the North Carolina Industrial Commission, alleging among other things his total and permanent disability by reason of having contracted silicosis while employed by Phillips between the dates of August 25, 1958 and February 21, 1959.

Following a hearing on his claim for compensation under the North Carolina Workman's Compensation Law he was awarded compensation insurance and received payments in full, all as is provided by the North Carolina law.

Thereafter this action was instituted against the defendant, the United States, as a third-party tort feasor, under the Federal Tort Claims Act.

The question at issue is the liability of the defendant for the claim asserted in this particular cause of action.

Under the General Statutes of North Carolina, § 97–10, any recovery had by plaintiff against the defendant in this action would first be used to repay the insurance carrier for the Workman's Compensation Insurance that had been previously paid him under his claim filed with the North Carolina Industrial Commission and thereafter if the recovery had was of sufficient amount, the remainder over and above that necessary to repay the insurance carrier would then become the sole property of the plaintiff.

This decision therefore involves the question of when the plaintiff contracted silicosis.

Plaintiff contends that such was contracted by him following his being employed on August 25, 1958 and up to and including February 27, 1959, when he quit his job and filed his claim with the North Carolina Industrial Commission.

The defendant claims that any show of silicosis as may have affected plaintiff was contracted by him while working elsewhere and not during his period of employment with Phillips, between the dates set out above involving the approximate six months period.

Plaintiff further contends that dust was continually in the room where he and other rifters were working; that no exhaust fans had been installed in this building to remove the accumulated dust; and finally that no breathing masks were furnished and that through these contentions it should be found from the evidence and by its greater weight, the burden being on the plaintiff, that the defendant was negligent and its negligence was the sole proximate cause of plaintiff's injury and damage.

Since this building has been used in the processing of mica under the contract of long standing between the defendant and one Fletcher O. Phillips, the defendant has consistently required that examinations be periodically made, so that any employee working in this plant

processing mica could as nearly as possible be afforded every protection that scientific operation required.

As early as April 23, 1956, at the direction of defendant, Dr. Harold J. Paulus, a representative of the Occupational Health Division of the United States Public Health Service, made an inspection of this plant to determine the amount of dust in the air. The evidence shows that he took thirteen samples of the air in the room where the rifters were working and that from such investigation the median or average amount of dust was 6.1 million particles per cubic foot of air. One among the thirteen samples was taken nearest the area where the unprocessed mica was being unloaded on the inside of the room and measured 19.2 million particles per cubic foot of air. It would therefore appear that when this last sample is excluded the median or average concentration of dust in the air of the building is 5.2 million particles per cubic foot.

The United States Public Health Service had determined from a long period of study that the amount of dust in a working area to which workers could safely be exposed in the mica industry was 20 million particles per cubic foot of air. Obviously meaning thereby that if workers in said mica processing industry were exposed to no more than 20 million particles of dust per cubic foot for an eight hour day and a 40 hour week, they would suffer no harmful effects. Scientifically this test seems to hold water and obviously it was that used in all examinations made by representatives of the Occupational Health Division of the United States Public Health Service.

At an earlier period the threshold limit values had been 50 million particles per cubic foot of air until further explorations made and studies had in 1951 reduced the limit to 20 million as a solid safety valve.

From the evidence it was further shown that following the taking of the one sample near the unloading operation, at one and of the building, which very nearly approximated the 20 million limit, a recommendation was made and an order placing it into effect was handed down, that the unloading be done outside the building.

Shortly thereafter and during 1956 an unloading depot was built and thereafter the unloading of the mined mica was made in such outside depot.

Dr. Paulus further recommended as another preventative measure that an industrial type of vacuum cleaner be used to clean the area where dust could possibly gather. This recommendation was immediately complied with.

On November 29, 1956, an Industrial Hygiene Engineer from the North Carolina Department of Public Health likewise made an inspection of the premises in line with his duties for the North Carolina Workman's Compensation Commission, took samples in the room where the rifting operation was carried on, and otherwise made a complete and positive check. When this inspection was made the air in the rifting area showed 3.2 million particles per cubic foot of air and another sample taken at the same time of the air at the places where the rifters were at work showed only 2.0 million particles per cubic foot of air.

The evidence further shows that on March 4, 1959, only a few days after plaintiff had stopped work in the plant, another representative of the North Carolina Department of Public Health made an inspection, taking full and complete air samples, and that this examination and inspection resulted in showing a concentration of dust of 2.2 million particles per cubic foot.

The North Carolina Department of Public Health has adopted the same threshold limit values of 20 million particles per cubic foot of air for the mica industry, as that of the United States Public Health Service, as it is generally recognized that silicosis once contracted cannot be definitely cured but can be aggravated by further and additional exposure.

The entire floor area which was in use for rifting of mica was cleaned with an

oily sweeping compound each day after work had been completed, though the evidence tended to show that in other mica plants in this area this program was not followed, but on the contrary only similarly engaged in about once a week. And the evidence is plenary to the effect that this mica processing plant was undoubtedly the cleanest in the industry. It is true that the rifters were not furnished with breathing masks, and neither were exhaust fans added since the evidence shows that neither of these alleged failures to install were on the required list or were even basically considered as worthwhile, as these features had never been recommended by the United States Public Health Service or the North Carolina Department of Health.

Silicosis customarily results from the patient's exposure over a period of some several years to an excess concentration of dust coming from the processing of mica, and ordinarily it would seem, from the opinion of the experts, that one's contraction of silicosis customarily comes from a long period of exposure. Certainly it is not likely that during the period between August 25, 1958 when he again engaged himself for work as a rifter, and until February 27, 1959, when he quit work, that it could be said that his employer, whomsoever it may have been, was negligent in failing to provide for him a safe place in which to do the work assigned to him, and that such negligence was the proximate cause of his injury and damage. One cannot be too impressed with this particular claim.

In the absence of a showing of negligence this action cannot be maintained. However, assuming that negligence was shown from the evidence and by its greater weight, was such negligence attributable to this defendant or to Phillips, the independent contractor who was plaintiff's employer, and against whom plaintiff's recovery was had under the Workmen's Compensation Claim. On the contrary if the evidence showed that plaintiff was the employee of this defendant, and not of Phillips, this action could not then be maintained on its merits as such relief then sought would be under the Federal Employees' Compensation Act. 5 U.S.C. § 751, and accordingly no jurisdiction would attach in this court under the Federal Tort Claims Act.

Since the plaintiff has failed to show that his condition is attributable to or resulted from the alleged negligence of the defendant, and which proximately resulted in his injury and damage, his claim for compensation by way thereof is denied.

Counsel will prepare decree.